**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

MADISON STREET PROPERTIES, LLC,

        Plaintiff,

vs.

THE MARCUS CORPORATION,

        Defendant.

Case No. 3:20-cv-50471

**MEMORANDUM OF LAW IN SUPPORT OF THE MARCUS CORPORATION'S
MOTION FOR ATTORNEYS' FEES AND COSTS**

## TABLE OF CONTENTS

I.    Introduction ................................................................................................. 1

II.   Factual Background ..................................................................................... 2

III.  Argument ..................................................................................................... 7

     A.    Marcus As The Prevailing Party Is Entitled To Its Attorneys' Fees Because This Case Is Exceptional ........................................................ 7

          1.   Madison has acted willfully and in bad faith to increase the burden on Marcus .......................................................................... 8

          2.   Madison's claims were objectively unreasonable .................................... 12

     B.    Marcus Is Entitled To Its Costs ........................................................ 14

IV.  Marcus's Attorneys' Fees Are Reasonable and Necessary to Litigate this Case ............ 15

V.   Conclusion ................................................................................................. 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*4SEMO.com Inc. v. S. Ill. Storm Shelters, Inc.*,
    939 F.3d 905 (7th Cir. 2019) ......................................................................... 8

*Butler v. Hotel Cal., Inc.*,
    106 F. Supp. 3d 899 (N.D. Ohio 2015) ....................................................... 14

*Coryn Group II, LLC v. O.C. Seacrets, Inc.*,
    868 F. Supp. 2d 468 (D. Md. 2012) ............................................................ 14

*Deckers Outdoor Corp. v. Australian Leather Pty. Ltd.*,
    16 CV 3676, 2020 WL 4723980 (N.D. Ill. July 13, 2020) ......................... 7, 8, 9

*Denius v. Dunlap*,
    330 F.3d 919 (7th Cir. 2003) ....................................................................... 15

*Farfaras v. Citizens Bank & Tr.*,
    433 F.3d 558 (7th Cir. 2006) ....................................................................... 15

*James Burrough, Ltd. v. Sign of Beefeater, Inc.*,
    540 F.2d 266 (7th Cir. 1976) ....................................................................... 13

*LHO Chicago River, L.L.C. v. Perillo*,
    942 F.3d 384 (7th Cir. 2019) ....................................................................... 7, 8

*LHO Chicago River, L.L.C. v. Rosemoor Suites, LLC*,
    988 F.3d 962 (7th Cir. 2021) ......................................................................... 7

*Medcom Holding Co. v. Baxter Travenol Labs., Inc.*,
    200 F.3d 518 (7th Cir. 1999) ....................................................................... 15

*Miche Bag, LLC v. Marshall Grp.*,
    818 F. Supp. 2d 1098 (N.D. Ind. 2010) ...................................................... 13

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) ...................................................................................... 7

*Pickett v. Sheridan Health Care Ctr.*,
    664 F.3d 632 (7th Cir. 2011) ....................................................................... 15

*Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*,
    No. 03 C 6070, 2004 WL 2474317 (N.D. Ill. Sept. 30, 2004) ..................... 3

*Quill Nat. Spring Water v. Quill Corp.*,
    No. 91 C 8071, 1994 WL 559237 (N.D. Ill. Oct. 6, 1994) ...................................................... 13

*Resorts Int'l, Inc. v. Greate Bay Hotel and Casino, Inc.*,
    Civil Action No. 90-3057, 1991 WL 352487 (D.N.J. Jan. 18, 1991) ....................................... 14

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*,
    925 F.2d 174 (7th Cir. 1991) ....................................................................................................... 1

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
    978 F.2d 947 (7th Cir. 1992) ..................................................................................................... 13

*Tisch Hotels v. Americana Inn, Inc.*,
    350 F.2d 609 (7th Cir. 1965) ..................................................................................................... 13

*Tisch Hotels, Inc. v. Atlanta Americana Motor Hotel Corp.*,
    254 F. Supp. 743 (N.D. Ga. 1966) ............................................................................................ 14

*Ty, Inc. v. Jones Grp. Inc.*,
    237 F.3d 891 (7th Cir. 2001) ..................................................................................................... 12

*Wis. Cheese Grp., Inc. v. V & V Supremo Foods, Inc.*,
    537 F. Supp. 2d 994 (W.D. Wis. 2008) ...................................................................................... 1

**Statutes**

15 U.S.C. § 1117(a) ............................................................................................................... 2, 7, 18

15 U.S.C. § 1127 ............................................................................................................................. 1

**Rules**

Fed. R. Civ. P. 54(d) ............................................................................................................ 2, 14, 18

**Other Authorities**

*McCarthy on Trademarks and Unfair Competition*, (5th ed.) ................................................ 1, 12

## I.    INTRODUCTION

Enforcement is crucial to the strength and very existence of a protectable trademark. "Trademarks are weak when they are merely one of a similar crowd of marks. . . . The only way a trademark owner can prevent the market from becoming crowded with similar marks is to undertake an assertive program of policing adjacent 'territory' and suing those who edge too close." *McCarthy on Trademarks and Unfair Competition*, § 11:91 (5th ed.) Therefore, "[t]he law imposes on trademark owners the ***duty*** to be pro-active and to police the relevant market for infringers. If the trademark owner is quiescent and tolerates the encroachment of infringers, it will find that its trademark asset has 'eroded' and 'shrunken' because the strength of its mark as a distinctive and distinguishing symbol has been diminished by the presence of similar marks." *Id.* (emphasis added); *see also Wis. Cheese Grp., Inc. v. V & V Supremo Foods, Inc.*, 537 F. Supp. 2d 994, 1001 (W.D. Wis. 2008) ("a trademark owner has an affirmative duty to police his trademark"). At its most extreme, the failure to police others' use of names that are confusingly similar to a trademark owner's mark can even lead to a total loss of rights as, by statute, a mark is deemed to be "abandoned," and thus loses its status as a trademark, "[w]hen any course of conduct of the owner, ***including acts of omission*** as well as commission, causes the mark . . . to lose its significance as a mark." 15 U.S.C. § 1127 (emphasis added); *see also Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991) (comparing "the duty of the holder of a trademark to take reasonable efforts to police infringements of his mark, failing which the mark is likely to be deemed abandoned, or to become generic or descriptive (and in either event be unprotectable)" to a trade secret owner's obligation to take precautions to keep the trade secret a secret). The instant dispute arose against the backdrop of these basic, but important, principles.

Over three years ago, on January 3, 2020, Defendant and Counterclaim Plaintiff The Marcus Corporation ("Marcus") requested that Plaintiff and Counterclaim Defendant Madison

Street Properties, LLC ("Madison") change the name of its just announced and not-yet-established Hotel Kate in Rockford, Illinois, (the "Rockford Hotel") to avoid infringing on Marcus's statutory and common law trademark rights in "SAINT KATE" (the "SAINT KATE Mark"). (Dkt. 1 at ¶ 15.) Marcus uses the SAINT KATE Mark in connection with the Saint Kate – The Arts Hotel (the "SAINT KATE Hotel") in Milwaukee, Wisconsin, and by the time it learned of the Rockford Hotel, Marcus had invested heavily in its SAINT KATE Hotel and had expended significant time, money, and effort to build goodwill around the SAINT KATE Mark. But Madison, despite having made no real investment in the name "Hotel Kate," ignored Marcus's request and, after months of silence, filed this suit on December 3, 2020, seeking a declaratory judgment that Madison's contemplated use of "Hotel Kate" does not infringe Marcus's federally registered and common law rights in the SAINT KATE Mark. Now, after more than two years of expensive litigation, under the auspices of "changed circumstances," Madison has capitulated and decided to abandon its infringing name for its Rockford Hotel. Because the Court has determined that Marcus is the prevailing party and because Madison's litigation tactics make this an exceptional case, Marcus respectfully requests that the Court award Marcus its attorneys' fees and costs under 15 U.S.C. § 1117(a) and Federal Rule of Civil Procedure 54(d). As described below and in the Declaration of Kadie M. Jelenchick ("Jelenchick Declaration"), Marcus respectfully requests **$507,084.50** in attorneys' fees and **$12,030.88** in costs.[1]

## II.   FACTUAL BACKGROUND

In 2019, Marcus—the owner of 17 hotels and resorts across the country—opened the SAINT KATE Hotel, a boutique hotel in Milwaukee, Wisconsin. Marcus filed a federal trademark application for the SAINT KATE Mark on July 5, 2018, and began promoting the hotel in

---

[1] Marcus will separately file its Bill of Costs.

November 2018. Since then, the SAINT KATE Hotel has become well-known and critically acclaimed,[2] with target and actual customers across the Midwest, including northern Illinois.

Around the same time Marcus began developing the SAINT KATE Hotel in Milwaukee, Madison began plans for a hotel in Rockford, just 90 miles away. Initially, Madison chose the name "Spafford House." (*See* Dkt. 54-1 at MSP009648, MSP009652-53.) Yet, without explanation, Madison eventually abandoned that name and decided to name the Rockford Hotel, "Hotel Kate." Madison further opted to keep pursuing that name after it learned of the SAINT KATE Hotel – despite the fact that many of its own employees and contractors noticed and commented on the obvious similarities between the two hotel names and the fact that Marcus was clearly the senior user of the mark. (*See, e.g.,* Dkts. 54-2, 54-3, 54-4.) Indeed, it was not until April 2019 that Madison sought trademark protection for "Hotel Kate," well after Marcus filed its trademark registration and began promoting the SAINT KATE Hotel. (Dkt. 1 at ¶ 11.) And although Madison's static hotelkate.com website went live in December 2019,[3] to date, Madison's hotel never opened to the public, never accepted guest reservations, and never invested in any advertising or promotional campaigns using the "Hotel Kate" name.

---

[2] *See, e.g., #10 Top Hotel in the Midwest*, Condé Nast Traveler's 2022 Readers' Choice Awards https://www.cntraveler.com/readers-choice-awards/united-states/midwest-top-hotels; Jodie Filenius, *Report: Saint Kate, Pfister ranked in top 20 hotels in the Midwest*, TMJ4 (Oct. 6, 2021, 3:15 PM), https://www.tmj4.com/news/local-news/report-saint-kate-pfister-ranked-in-top-20-hotels-in-the-midwest; *Best New Hotel*, USA Today's 2019 10 Best Readers' Choice Awards, https://www.businesswire.com/news/home/20200113005781/en/.

[3] Madison registered the hotelkate.com domain name in April 2018. (Dkt. 1 at ¶ 10.) Although Madison previously attempted to argue that its domain registration gives it superior rights with respect to "Hotel Kate," "[t]he law is clear that the mere registration of a domain name does not constitute the use of the domain name as a trademark." *Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*, No. 03 C 6070, 2004 WL 2474317, at *3 (N.D. Ill. Sept. 30, 2004). This argument is yet another example of the meritless positions Madison has taken throughout this case.

Despite affirmative knowledge of confusion in the market (and potential infringement of Marcus's SAINT KATE Mark) and affirmatively tracking any and all of the SAINT KATE Hotel's mentions in the media, Madison decided not to change the name. (*See* Dkts. 54-2, 54-3, 54-4.) Following Madison's December 2019 announcement of the development of the Hotel Kate, Marcus put Madison on notice of its infringement. After receiving this notice, despite its clear lack of investment in the "Hotel Kate" name, which Madison had not yet used in commerce, Madison did nothing to cease or mitigate its infringement and pressed forward with its efforts to secure a federally registered trademark. Then, in December 2020, after months of silence from Madison and nearly a year after Marcus's initial letter, Rockford-based Madison suddenly filed a Complaint for Declaratory Judgment against Marcus in this Court, seeking a declaration that its use of the "Hotel Kate" name did not infringe Marcus's SAINT KATE Mark. (Dkt. 1.)

In the more than two years since Madison brought this suit, the parties have completed extensive fact discovery, including exchanging documents, written discovery requests, subpoenaing multiple third party witnesses for documents and testimony, and taking nine depositions, retained experts and exchanged expert reports, and had nearly completed all necessary pre-trial tasks, including participating in a formal mediation. Marcus has incurred significant legal fees and expenses as a result of defending this action. And, even after it decided to abandon its ill-fated claim to the infringing "Hotel Kate" name, Madison was not done forcing Marcus to incur further expenses.

On June 14, 2022, Madison moved to voluntarily dismiss the Complaint for Declaratory Judgment due to "changed circumstances" and abandoned its pending trademark application for the Hotel Kate mark. (Dkt. 46.) Marcus promptly informed Madison that it opposed any unconditional dismissal without prejudice and instead sought either dismissal with prejudice or

payment of Marcus's attorneys' fees as a condition of dismissal without prejudice, as reflected in the parties' June 17, 2022 Joint Status Report. (Dkt. 47 at 2.) Madison did not withdraw its motion for voluntary dismissal or agree to dismissal with prejudice at that time. As a result, Madison forced the parties down a path that would lead to extensive motion practice regarding the terms under which dismissal could or should be granted.

As ordered by the Court, (Dkt. 49, Dkt. 51), Marcus filed its opposition to Madison's motion for voluntary dismissal on August 5, 2022.[4],[5] (Dkt. 52.) In that opposition, Marcus laid out in detail why it was entitled as a matter of law either to an award of fees as a condition of dismissal without prejudice or, in the alternative, to dismissal of Madison's claims **with** prejudice. (*See generally id.*) Still, Madison did not withdraw its motion for voluntary dismissal or agree to dismissal with prejudice. Instead, it filed a barebones reply asserting, with nominal legal support, that only unconditional dismissal without prejudice would do. (Dkt. 59.) Notably, Madison's response said nothing about an alleged lack of assets with which it could pay Marcus's attorneys' fees. Indeed, as the Court ultimately recognized it is original dismissal order, "Madison seemingly ***does not dispute awarding fees and costs to Marcus***." (Dkt. 61 at 7 (emphasis added).)

---

[4] Marcus's opposition was originally due on July 18, 2022. (Dkt. 49.) However, shortly before this date and despite Madison's representations during the June 28, 2022 telephonic conference that it would promptly cease its use of the "Hotel Kate" name, Marcus learned that the hotelkate.com website and Hotel Kate social media pages were still publicly accessible at least as late as July 14, 2022 – a full month after Madison filed its motion to dismiss its complaint referring to "changed circumstances." Although it appears that Madison finally took down these online materials shortly thereafter, it is worth noting that this occurred only after Marcus's counsel wrote to counsel for Madison and prompted it to do so. (Dkt. 54-5.)

[5] The Court also instructed Marcus to file a parallel motion for attorney's fees. (Dkt. 49 ("For reasons stated in open court, Defendant The Marcus Corporation shall file . . . its motion for attorney's fees . . . .").) Marcus complied with the Court's instructions and filed its motion for attorneys' fees on August 5, 2022. (Dkts. 53, 54.) That motion was denied as moot when the Court granted Madison's motion to dismiss without prejudice on the condition that Madison pay Marcus its reasonable attorneys' fees. (Dkt. 61 at 8.)

On October 31, 2022, the Court entered an order granting dismissal without prejudice conditioned on Madison's payment of Marcus's attorneys' fees. (Dkt. 61.) In that order, the Court recognized that "this case has been litigated for nearly two years, significant discovery has occurred including, nine depositions, retaining expert reports, and subpoenas to third parties," and that "[i]t is undeniable that this discovery and briefing up until this point has caused Marcus to incur substantial fees and expenses in defending this case. . . ." (*Id.* at 7.) As a result, the Court found that "[a]llowing Madison to simply drop the case without compensation for Marcus's defense efforts would cause 'plain legal prejudice.'" (*Id.*) The Court therefore granted Marcus its fees and warned Madison that "a party entitled to fees may also be entitled to fees expended in recovering fees." (*Id.* at 8.)

It soon became clear, however, that Madison had no intention of attempting to reimburse Marcus for the extensive attorneys' fees it was forced to incur to defend against Madison's declaratory judgment claims. On December 5, 2022, Madison filed a motion to withdraw its earlier motion for voluntary dismissal and replace it with a motion to dismiss with prejudice. (Dkt. 63.) In that motion, Madison asserted for the very first time that it was "a single asset LLC and does not have the resources to pay" Marcus's attorneys' fees and costs. (*Id.* at ¶ 6.) Nothing was said as to how Madison was and is paying its own attorneys' fees. (*See generally id.*)

Following briefing by the parties, (Dkts. 65, 71, 73), and a hearing, (Dkt. 69), on April 12, 2023, the Court granted Madison's motion to withdraw its motion for voluntary dismissal and dismissed Madison's claims with prejudice. (Dkt. 74 at 7.) Marcus's counterclaims were dismissed without prejudice. (*Id.*) The Court further found that Marcus was the prevailing party. (*Id.*)

III.    **ARGUMENT**

A.    **Marcus As The Prevailing Party Is Entitled To Its Attorneys' Fees Because This Case Is Exceptional**

The Court has already determined that Marcus is the prevailing party in this action. (Dkt. 74 at 6.) Under the Lanham Act, Marcus as the prevailing party may in "exceptional cases," like this one, recover its "reasonable attorney fees." 15 U.S.C. § 1117(a). In assessing exceptionality, courts have rejected a rigid standard and instead look to the "totality of the circumstances." *LHO Chicago River, L.L.C. v. Perillo*, 942 F.3d 384, 388-89 (7th Cir. 2019) ("*LHO Chicago River I*"); *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). That is, when analyzing whether a case is "exceptional" for purposes of awarding attorneys' fees under the Lanham Act, courts consider the substantive strength of a party's litigation position and the unreasonable manner in which the case was litigated. *LHO Chicago River, L.L.C. v. Rosemoor Suites, LLC*, 988 F.3d 962, 967 (7th Cir. 2021) ("*LHO Chicago River II*"); *see also Octane Fitness*, 572 U.S. at 554 ("[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."). Determining whether a case is "exceptional" is determined on a case-by-case basis. *Octane Fitness*, 572 U.S. at 554.

In making an exceptional case determination, courts particularly consider the following factors: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *LHO Chicago River I*, 942 F.3d at 386. Further, willful infringement is a significant factor when finding a case exceptional. Indeed, "[w]illfulness alone can justify an exceptional-case finding." *Deckers Outdoor Corp. v. Australian Leather Pty. Ltd.*,

7

16 CV 3676, 2020 WL 4723980, at *7 (N.D. Ill. July 13, 2020); *see also 4SEMO.com Inc. v. S. Ill. Storm Shelters, Inc.*, 939 F.3d 905, 913-14 (7th Cir. 2019) (reversing denial of attorneys' fees in trademark case where infringers "acted in bad faith, intentionally, willfully[,] and maliciously[;] [and] have refused to cease the infringing activity") (alterations in original). Overall, this framework gives courts "equitable discretion" in light of these factors to grant attorneys' fees. *LHO Chicago River I,* 942 F.3d at 388.

Here, because this case is "exceptional," Marcus is entitled to its reasonable attorneys' fees.

### 1. Madison has acted willfully and in bad faith to increase the burden on Marcus

Madison has acted willfully, and "[w]illfulness alone can justify an exceptional-case finding." *Deckers Outdoor*, 2020 WL 4723980, at *7; *see also 4SEMO.com*, 939 F.3d at 913-14. Throughout the course of this litigation, Madison pressed its meritless claims for over eighteen months, imposing significant expenses on Marcus, only to drop the case and agree to take the actions proposed by Marcus at the start after being served with expert reports demonstrating what Marcus has been telling it all along – that Madison's conduct created real consumer confusion. Changing the name of the Rockford Hotel years ago would have resulted in minimal expense for the parties—Madison had not made any meaningful investment in the "Hotel Kate" name and already had a list of dozens of alternative names to choose from. (*See* Dkt. 54-1 at MSP009652-54.) Further, Madison had no demonstrated attachment to the name, let alone one that would justify two years of litigation. Madison's Rockford Hotel was not and still is not built out, is not open to the public, has not begun accepting guest reservations, and has not engaged in any advertising or promotional campaigns. Instead of seeking a business resolution to this dispute or simply reverting to the previously selected name – the Spafford House – Madison's response to Marcus's notice of

infringement was months of silence followed by the sudden filing a lawsuit. This is not rational or good faith conduct.

There is no credible dispute that Madison knew of Marcus's SAINT KATE Mark and the SAINT KATE Hotel well before it ever announced the "Hotel Kate" name to the public or filed its own trademark application. In fact, Madison "start[ed] following" any and all mentions of the SAINT KATE Hotel in the media shortly after learning it opened. (*See* Dkt. 54-4.) Madison's own documents and deposition testimony further indicate it was aware of potential trademark issues. (*See, e.g.,* Dkt. 54-3.) Against this backdrop, Madison's knowledge of and disregard for Marcus's trademark rights strongly supports a finding of willfulness, which alone would support finding this case "exceptional." *Deckers Outdoor*, 2020 WL 4723980, at \*7.

Likewise, Madison's conduct during discovery underscores its bad faith behavior. Madison's initial disclosures identified ***fifteen*** individuals as "likely to have discoverable information" or "parties to various discussions relating to the Hotel Kate project, including the selection of the Hotel Kate Mark." (Ex. A.) Although Marcus was able to mitigate the time and costs associated with running Madison's broad assertions to ground by foregoing depositions or third party discovery requests for more than half of these individuals, it still ultimately deposed seven witnesses, which included third parties, in order to obtain fulsome discovery establishing Madison's willful infringement, its lack of investment in the "Hotel Kate" name, and inequitable conduct associated with Madison's prosecution of its Hotel Kate trademark application.[6] Marcus deposed:

(i) Peter Provenzano, Madison's principal;

---

[6] The number of depositions Marcus ultimately took is not out of the norm. Madison itself served notices of depositions to seven individuals, in addition to noticing a Rule 30(b)(6) deposition of Marcus. (Ex. B.)

(ii) Bob Saiz, Chief Financial Officer of Provenzano-owned company SupplyCore, who handled financing matters for Madison;

(iii) Nellie Miller, Director of Marketing at SupplyCore, who handled marketing and communications for Madison;

(iv) Mark Robinson, former General Counsel of SupplyCore, who handled real estate development and trademark filings for Madison;

(v) Aaron Hautala, a marketing consultant hired to work on naming and branding for the Rockford Hotel who purportedly came up with the "Hotel Kate" name;

(vi) Craig "Nedd" Nedderson, Chief Operations Officer of IDM Hospitality, who was hired to manage the Hotel Kate; and

(vii) Rick Wells, another marketing consultant hired to work on naming and branding for the Rockford Hotel only to be replaced by Mr. Hautala.

While Madison complains about the breadth of discovery that it necessitated by refusing to identify a focused set of individuals, among other things, this discovery uncovered that Madison engaged in misconduct before the United States Patent and Trademark Office ("PTO") in an apparent attempt to gain leverage over Marcus in this litigation. As detailed in Marcus's First Amended Counterclaims, (Dkt. 40), Madison committed fraud on the PTO, falsely representing that it would be pursuing foreign trademark protection that required it to secure a U.S. registrations in an (ultimately successful) attempt to accelerate examination of its trademark application and gain some kind of perceived advantage in its ongoing dispute with Marcus. (*See id.* at ¶¶ 20-31.) In reality, as Madison's sole principal Peter Provenzano admitted during his deposition, Madison never had any intention of seeking foreign trademark protection for the "Hotel Kate" name at all, let alone protection in a country whose trademark regime would first require a U.S. registration.

10

(*Id.*) As such, Madison's conduct before the PTO represents yet another attempt by Madison to gain benefits to which it had no rights to the detriment of Marcus.

Finally, by filing this suit in response to Marcus's notice of infringement, Madison flipped the typical trademark infringement enforcement scheme on its head and forced Marcus to litigate in Madison's preferred venue on Madison's timeline. Where Marcus could typically decide for itself what attorneys' fees and costs it might be willing to incur to protect its trademark if and when Madison got the Hotel Kate off the ground, here, the infringer (Madison) sued the trademark holder (Marcus) in the infringer's own backyard when Madison's hotel project was speculative at best.

While Madison has ultimately given up its infringing name, it was not before imposing significant expenses on Marcus and wasting significant resources of this Court. Indeed, Madison's behavior is indicative of the "nothing to lose" attitude it has displayed from the outset. Throughout the lawsuit and even in the early court-mediated settlement conference, (*see* Dkt. 30), Madison insisted that it was opening the Hotel Kate and refused to even consider a name change when nothing about the project depended on using the "Hotel Kate" name. Madison approached this case as a no-lose situation. In the unlikely event that it prevailed, Madison would be free to begin building up its preferred "Hotel Kate" name. If Madison lost, its lack of existing investment in the "Hotel Kate" name meant it would cost little to nothing to shift to one of the myriad of other names it had already identified. Meanwhile, Marcus is left to absorb the legal fees it incurred from Madison pursuing its declaratory judgment claims. And, when Marcus prevailed – as it did – Madison now simply cries poverty despite being propped up by SupplyCore and its personnel from the beginning.

11

Collectively, the evidence supports that Madison was acting in bad faith, and Madison's litigation tactics willfully imposed unnecessary costs on Marcus who was simply trying to preserve its rights in its federally registered SAINT KATE Mark.

### 2. Madison's claims were objectively unreasonable

The objective unreasonableness of Madison's actions is underscored by the relative weakness of Madison's claims and its willful infringement of Marcus's SAINT KATE Mark. Marcus was the first to file its trademark application, the first to use its mark in commerce, and the first to successfully register its mark. Accordingly, Marcus has senior rights in its mark and nationwide priority as a result of its senior federal registration. Moreover, there is a significant likelihood of confusion resulting from Madison's use of "Hotel Kate," particularly in view of the similarity of the marks, the geographic overlap, and the identical nature of the parties' goods and services. *See Ty, Inc. v. Jones Grp. Inc.,* 237 F.3d 891, 898 (7th Cir. 2001) (finding similarity in marks and similarity in goods or services offered under the marks significant factors in determining trademark infringement).

Indeed, during expert discovery, Marcus's two experts confirmed the confusion between the parties' overlapping marks.[7] (Dkt. 54-6 at ¶ 77; Dkt. 54-7 at ¶¶ 11, 33.) For example, Marcus's expert Dr. Englis offered opinions directed to evaluating likelihood of confusion that were grounded in a study of potential relevant consumers based on standard research conditions, yielding 30.9% net consumer confusion. (Dkt. 54-6 at 23.) "Generally, figures in the range of 25% to 50% have been viewed as solid support for a finding of a likelihood of confusion." *McCarthy*, § 32:188. The results of Dr. Englis's survey reveal that a significant number of people **are** confused

---

[7] On the other hand, Madison's expert, Ms. Schlumpf, said nothing about any actual consumer confusion. Her report was little more than unsubstantiated and self-serving opinions unlikely to survive any *Daubert* challenge.

by the obvious similarities between Marcus's SAINT KATE mark and Madison's "Hotel Kate" name. Indeed, the net percentage of confusion is dramatically higher than the amounts of net confusion both the Northern District of Illinois and the Seventh Circuit have found to demonstrate "substantial" confusion in the past. *See, e.g., Quill Nat. Spring Water v. Quill Corp.*, No. 91 C 8071, 1994 WL 559237, *8, *10 (N.D. Ill. Oct. 6, 1994) (net confusion in parties' respective surveys ranged from 12.7% to 28.5%; "[s]ignificantly, in this case both parties' surveys found a substantial percentage of respondents were likely to be confused by the similar marks"); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992) (24% confusion); *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976) (15% confusion); *Miche Bag, LLC v. Marshall Grp.*, 818 F. Supp. 2d 1098 (N.D. Ind. 2010) (16.2% confusion for one set of products, 27.1% confusion for another set of products). It strains credulity to think it is a mere coincidence that Madison would suddenly abandon its plans for the "Hotel Kate" name after Marcus disclosed such damning evidence of confusion.

Also, with respect to Madison's repeated efforts to suggest that the 90 mile difference between the location of Marcus's SAINT KATE Hotel and the location of Madison's planned Rockford Hotel obviated any risk of consumer confusion – as shown during discovery, this is simply incorrect. Madison's own deponents confirmed that Madison intended to advertise the Rockford Hotel in locations that overlapped with areas where the SAINT KATE Hotel is located and promoted. (*See* Dkt. 54-6 at ¶ 16 (compiling deposition testimony).) The Seventh Circuit and district courts around the country have consistently recognized the significant risk of consumer confusion that results from similar hotel names even when the hotels are not in the same geographic locale. *See, e.g., Tisch Hotels v. Americana Inn, Inc.*, 350 F.2d 609 (7th Cir. 1965) (reversing district court judgment and holding that plaintiffs who operated hotels in Florida, New York, and

Puerto Rico were entitled to injunctive relief given likelihood of confusion where defendants operated motels in Chicago under a similar name); *Butler v. Hotel Cal., Inc.*, 106 F. Supp. 3d 899 (N.D. Ohio 2015) (granting TRO and finding likelihood of confusion based on similar names of defendants' Ohio hotel and plaintiff's California hotels); *Coryn Group II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468 (D. Md. 2012) (granting permanent injunction and finding likelihood of confusion based on similar names of plaintiff's Maryland hotel and defendant's hotels in Mexico and the Caribbean); *Tisch Hotels, Inc. v. Atlanta Americana Motor Hotel Corp.*, 254 F. Supp. 743 (N.D. Ga. 1966) (granting permanent injunction and finding likelihood of confusion based on similar names of plaintiffs' hotels in Florida, New York, and Puerto Rico and defendant's Georgia motel); *Resorts Int'l, Inc. v. Greate Bay Hotel and Casino, Inc.*, Civil Action No. 90-3057, 1991 WL 352487 (D.N.J. Jan. 18, 1991) (granting preliminary injunction and finding likelihood of confusion based on similar names of plaintiff's Bahamas resort and defendant's New Jersey hotel and casino). This highlights the objective unreasonableness of Madison's pursuit of this case, as well as its imposition of significant attorneys' fees and expenses upon Marcus.

When taken together, the totality of the circumstances stands out from other cases and justifies deeming this case exceptional such that Marcus should be awarded attorneys' fees.

### B.   Marcus Is Entitled To Its Costs

Under Federal Rule of Civil Procedure 54(d)(1), Marcus, as the prevailing party, should be awarded its costs unless a statute provides otherwise. Fed. R. Civ. P. 54(d)(1). Per the Court's directive, (Dkt. 74 at 6), Marcus submits its Bill of Costs and the supporting Declaration of Sarah E. Rieger, which are separately-filed pursuant to Local Rule 54.1, detailing its full taxable costs of **$12,030.88**.

IV.    **MARCUS'S ATTORNEYS' FEES ARE REASONABLE AND NECESSARY TO LITIGATE THIS CASE**

The Seventh Circuit has approved the use of the "lodestar" method in assessing the reasonableness of attorneys' fees. *Farfaras v. Citizens Bank & Tr.*, 433 F.3d 558, 569 (7th Cir. 2006). "The lodestar figure is arrived at by multiplying the number of hours reasonably expended on litigation by a reasonable hourly rate." *Id.* The Seventh Circuit has "defined a reasonable hourly rate as one that is 'derived from the market rate for the services rendered.'" *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011) (quoting *Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003)). The Seventh Circuit further presumes that "an attorney's actual billing rate for similar litigation is appropriate to use as the market rate." *Id.* Additionally, evidence that fees billed to the client were "*actually paid* in the ordinary course of its business" suggests that the fees charged were commercially reasonable. *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 520 (7th Cir. 1999) (emphasis in original).

Here, the amount of work that was reasonable and necessary in this case justifies the hours spent by Marcus's attorneys to defend against Madison's declaratory judgment action and the corresponding fees and expenses. (Jelenchick Decl. at ¶ 3.) In more than two years of litigation, Marcus has incurred fees in the amount of $507,084.50.[8] (*Id.* at ¶ 18.)  The total amount of billable time to litigate this case was 863.3 hours, and the rates of the attorneys working on this matter ranged from approximately $380 to approximately $780 per hour. (*Id.* at ¶¶ 5-18.) Marcus is not seeking the more than $86,000 in expenses associated with retaining and working with its experts. (*Id.* at ¶ 4.)

---

[8] The Jelenchick Declaration includes a summary table of attorneys' fees as well as the redacted invoices detailing the work performed and other salient details. (Jelenchick Decl. at ¶¶ 18-19.)

Specifically, to defend against Madison's declaratory judgment claims and combat its infringement, counsel for Marcus:

- Investigated Madison's infringing activities and prepared multiple cease and desist letters;

- Corresponded with Madison counsel regarding the cease and desist letters and explored the viability of settlement without the need for litigation;

- Following Madison's filing of its declaratory judgment complaint, performed the necessary pre-claim investigation to support the pleaded counterclaims;

- Prepared and filed the original Answer, Affirmative Defenses, and Counterclaims (Dkt. 10), which included detailed allegations regarding Madison's trademark infringement;

- Prepared multiple status reports throughout the pendency of this litigation (*e.g.*, Dkts. 12, 33, 35, 41, 47, 62);

- Conducted witness interviews for Rule 26 disclosures;

- Engaged in substantial written discovery and document collection and production;

- Reviewed Madison's document productions and communicated with Madison's counsel regarding significant deficiencies in the same;

- Engaged in settlement negotiations with Madison's counsel;

- Participated in Court-brokered mediation and prepared mediation statement in advance of the same;

- Prepared for and took multiple depositions of individuals identified in Madison's initial disclosures, including third party witnesses;

- Engaged in substantial third party discovery, including the preparation of

16

subpoenas for the production of documents and third party depositions;

- Prepared and filed the Amended Counterclaims following the discovery of new evidence of fraud by Madison on the Trademark Office (Dkt. 40);

- Prepared and defended Marcus witnesses for deposition, including Marcus's President and Chief Executive Officer, Greg Marcus, and Chief Commercial Officer, Andrew Flack;

- Partnered with two experts, Dr. Basil Englis and Dr. Chekitan Dev, in memorializing the results of Dr. Englis's study demonstrating consumer confusion and Dr. Dev's rebuttal of Madison's deficient expert report;

- Prepared and filed multiple briefs related to Madison's request to dismiss its claims following the service of expert reports, as well as Madison's follow-on efforts to avoid the payment of Marcus's attorneys' fees (Dkts. 52, 65, 71);

- Prepared and filed an initial motion for attorneys' fees as the Court's direction (Dkt. 53); and

- Prepared for and attended in-person hearing on Madison's motion to withdraw its motion for voluntary dismissal (Dkts. 67, 69).

(Jelenchick Decl. at ¶ 2.)

As detailed in the accompanying Jelenchick Declaration, the legal services rendered in this case were provided in a cost-effective and efficient manner by a team from a national law firm and were billed at negotiated hourly rates. (*Id*. at ¶¶ 5-6.) Certain legal services were also written off, including time related to a planned deposition of Marcus's President and Chief Executive Officer, which Madison's counsel scheduled but failed to attend, which then required rescheduling. (*Id*. at ¶ 6, n.1.) The bills were reviewed and generally submitted monthly to Marcus following counsel's

evaluation of the work done and time spent. (*Id*. at ¶ 6.) With the exception of its April 2023 invoice, which was only just submitted, Marcus has paid all invoices in connection with this matter. (*Id*. at ¶ 19.) Marcus has not yet been billed for the outstanding time recorded in preparation of this Motion and related submissions. (*Id*.)

## V.     CONCLUSION

For the foregoing reasons, Marcus is the prevailing party in this case, and this case is exceptional. Accordingly, Marcus respectfully requests that this Court award Marcus its reasonable attorneys' fees under 15 U.S.C. § 1117(a) ($507,084.50) and its taxable costs under Federal Rule of Civil Procedure 54(d) ($12,030.88), totaling $519,115.38.

Dated: May 11, 2023                                              Respectfully submitted,

                                                                */s/Kadie M. Jelenchick*
                                                                Kadie M. Jelenchick
                                                                Sarah E. Rieger
                                                                Foley & Lardner LLP
                                                                777 East Wisconsin Avenue
                                                                Milwaukee, WI 53202-5306
                                                                414.271.2400
                                                                414.297.4900
                                                                kjelenchick@foley.com
                                                                srieger@foley.com

                                                                ***Attorneys for Defendant and Counterclaim
                                                                Plaintiff The Marcus Corporation***