**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| Madison Street Properties, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 20 CV 50471 |
| | ) Judge Iain D. Johnston |
| The Marcus Corporation, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

On April 12, 2023, the Court granted Madison Street Properties' (Madison) motion to voluntarily dismiss the case with prejudice under Rule 41. Dkt. 74. As anticipated in and allowed by that order, the Marcus Corporation (Marcus) now seeks an award of attorneys' fees under 15 U.S.C. § 1117(a) of over $500,000.00. Dkt. 77, 78.

In an exercise of discretion, the Court denies Marcus' motion and does not award attorneys' fees under § 1117(a) because Marcus has failed to meet its burden to establish that this case is exceptional. This case doesn't stand out. The reasons supporting this discretionary ruling follow.

## PRELIMINARY MATTERS

As a preliminary matter, although courts are duty bound to address them, it's safe to say that many courts don't like fee disputes. *See, e.g., Ustrak v. Fairman*, 851 F.2d 983, 987-88 (7th Cir. 1988). This Court is no exception. *DR Distribs., LLC v. 21 Century Smoking, Inc.*, No. 12 CV 50324, 2022 U.S. Dist. LEXIS 183697, at *2

(N.D. Ill. Oct. 6, 2022) ("If Dante were a judge, he would have placed fee litigation as an inner circle of judicial hell.").  One reason attorneys' fee petitions are distasteful is that often the attorneys' fee tail wags the merits dog.  *Sit N' Stay Servs. v. Hoffman*, No. 17 CV 116, 2019 U.S. Dist. LEXIS 17731, at *15 n.7 (W.D.N.Y. Feb. 1, 2019).  And fee litigation often becomes very personal between counsel with much vitriol and finger pointing, with the purpose being to punish opposing counsel and parties.  Often, motions seeking attorneys' fees are akin to Frank Costanza's airing of grievances at Festivus.  The filings for this motion have that flavor.  Indeed, many of the flings in this case are lava hot.  Rather than respond in kind, this Court will attempt to reduce the temperature with a calm analysis, showing how it exercised its discretion under Section 1117(a).

Section 1117(a) provides a statutory basis to award attorneys' fees.  15 U.S.C. § 1117(a).  The statutory text is both similar to and different from other provisions, even those allowing for fees in intellectual property cases.  *Compare* 35 U.S.C. § 285 *with* 17 U.S.C. § 505; *see Live Face on Webb, LLC v. Cremation Soc'y of Ill., Inc.*, 77 F.4th 630 (7th Cir. 2023) (discussing § 505 which presumes the prevailing party is entitled to attorneys' fees).  Section 1117(a) provides that a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).  Two key terms in the text are "exceptional" and "may."

Marcus prevailed in this litigation.  Dkt. 74, at 6.  But prevailing is a necessary, not sufficient, requirement under Section 1117(a).  *Munchkin, Inc. v. Luv N' Care, Ltd.*, 960 F.3d 1373, 1380 (Fed. Cir. 2020) ("That Munchkin's patent was

ultimately held unpatentable does not alone translate to finding its defense of the patent unreasonable."). The case must also be "exceptional." "Exceptional" means "uncommon," "rare" or "not ordinary." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). A fee award under this provision is not to be used as a penalty for failing to prevail. *See Spineology, Inc. v. Wright Med. Tech., Inc.*, 910 F.3d 1227, 1231 (Fed. Cir. 2018). In determining whether a case is exceptional, the Seventh Circuit—like most circuits[1]—adopted the Supreme Court's analysis of 35 U.S.C. § 285 in *Octane Fitness*, 572 U.S. at 554. *See Lho Chi. River L.L.C. v. Rosemoor Suites, LLC*, 942 F.3d 384, 388-89 (7th Cir. 2019) (*Chicago River I*). Under Section 1117(a), an exceptional case "stands out from others with respect to [1] the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or [2] the unreasonable manner in which the case was litigated." *Lho Chi. River L.L.C. v. Rosemoor Suites, LLC*, 998 F.3d 962, 964 (7th Cir. 2021) (*Chicago River II*) (*quoting Octane Fitness*, 572 U.S. at 554). In determining whether a case is exceptional, a district court must exercise its discretion, considering the totality of the circumstances. *Id.*

Before beginning with the analysis under Section 1117(a), three larger issues must be addressed: (1) the influence of discretion in determining whether to award fees; (2) the burden of proof and which party bears that burden; and (3) the

---

[1] *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1335 (Fed. Cir. 2017) ("Since *Octane* was decided, the Third, Fourth, Fifth, Sixth, and Ninth Circuits have all held that the *Octane* 'Court was sending a clear message that it was defining "exceptional" not just for the fee provision in the Patent Act, but for the fee provision in the Lanham Act as well."')

processes for determining the underlying facts to exercise discretion. Although the parties did not address these issues, they are critical in analyzing the motion.

First, in determining whether to award attorneys' fees under Section 1117(a), the district court has broad discretion. Indeed, in *Chicago River II*—the seminal Seventh Circuit case addressing Section 1117(a)—the Seventh Circuit explained the expansive scope of discretion.[2] Under this standard, there need only be a basis in reason, meaning whether *any* reasonable person could agree. *Chicago River II*, 988 F.3d at 967. So, the standard of review is deferential, allowing appellate courts to routinely affirm the district courts. *Id.* In fact, under the abuse of discretion standard, two district judges faced with the same set of facts may arrive at opposite conclusions, with neither one committing an abuse of discretion. *See United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir. 1996). But discretion is not without limits. Courts must correctly apply the law and not make clear factual errors. *Chicago River II*, 988 F.3d at 967. The court must provide a concise but clear explanation. *Munchkin*, 960 F.3d at 1378.

---

[2] The court's conclusion in *Chicago River II* is telling in this regard:

> Perhaps there is a reasonable way to weigh the facts in Rosemoor's favor. Perhaps there's not. We only need to decide if any reasonable person could agree with the district court's conclusion. We think most would. The district court considered the evidence under the *Octane Fitness* framework and reasonably determined that this case did not qualify as exceptional. It thus did not abuse its discretion in denying Rosemoor's renewed request for attorney fees.

*Chicago River II*, 988 F.3d at 970.

Second, which party bears the burden on an issue and the quantum of proof necessary to meet that burden is critical, particularly in a close case. *See United States ex rel. Bilyew v. Franzen*, 686 F.2d 1238, 1248 (7th Cir. 1982) ("If the evidence is closely balanced, then common sense indicates there is a reasonable possibility that who bears the burden of proof will determine the outcome."); *United States v. Thevis*, 665 F.2d 616, 633 n.17 (5th Cir. 1982) ("In addition, the 'clear and convincing' standard of proof dictates that close cases must be resolved in favor of the defendant."). Like most matters, under Section 1117(a), the movant bears the burden. *Munchkin*, 960 F.3d at 1378. With respect to the standard, the law is slightly less clear. *Chicago River II*, 988 F.3d at 966 n.3. But the consensus of the circuits is that the standard of proof is a preponderance of the evidence. *Munchkin*, 960 F.3d at 1378; *Verisign, Inc. v. XYZ.COM LLC*, 891 F.3d 481, 484-85 (4th Cir. 2018). The one hiccup comes from the Fifth Circuit. In 2016, the Fifth Circuit rejected the clear and convincing standard. *See Baker v. DeShong*, 821 F.3d 620, 625 (5th Cir. 2016). But, in 2021, the Fifth Circuit adopted the clear and convincing standard. *Spectrum Ass'n Mgmt. of Tex., L.L.C. v. Lifetime HOA Mgmt. L.L.C.*, 5 F.4th 560, 566-67 (5th Cir. 2021). This Court has no trouble rejecting the clear and convincing standard based on the weight of authority from the other circuits, the Fifth Circuit's failure to cite authority for the clear and convincing standard, the Seventh Circuit's explicit resistance to apply the clear and convincing standard unless statutorily or constitutionally required, *Ramirez v. T&H Lemon, Inc.*, 845 F.3d 772, 778 (7th Cir. 2016), and the Supreme Court's rejection of that standard in

*Octane Fitness*, 572 U.S. at 557. So, Marcus has the burden to establish by a preponderance of the evidence that the case is exceptional.

Third, although the ultimate determination to award attorneys' fees under Section 1117(a) is discretionary, when exercising that discretion district courts should consider certain factors, including frivolousness, motivation, objective unreasonableness, and the need to advance compensation and deterrence. *Chicago River I*, 942 F.3d at 388-89. Not surprisingly, the parties will have very different views on these considerations, which will require district courts to make findings as to these considerations. Among other tools and processes, this Court often looks to the guidance it provides jurors during trial. For example, Civil Pattern Jury Instruction 1.11 instructs jurors to use common sense in weighing evidence and consider the evidence in light of observations in life. Further, the instructions on deciding what to believe and prior inconsistent statements is useful. Civil Pattern Instruction 1.13 & 1.14. Likewise, once opinion witnesses overcome any *Daubert* challenges, their testimony is judged the same way as any other witness, so that this Court is not required to accept it; instead, this Court should consider the reasons for the opinion, the witness' qualifications, and the other evidence. Civil Pattern Instruction 1.21. After all, if these are legal principles jurors are instructed to use at trial, they are just as applicable to judicial fact finding. *See DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 870 (N.D. Ill. 2021). Additionally, this Court often takes guidance from Occam's razor: when confronted with different explanations for an occurrence, the simplest is the most likely

6

explanation. *United States v. Withers*, 960 F.3d 922, 934 (7h Cir. 2020) (Easterbrook, J. concurring); *Siefert v. United States Dep't of Educ.*, 633 B.R. 365, 369 (Bankr. N.D. Ind. 2021). Again, these tools just provide guidance. They may not be foolproof, but they can be useful. *Raila v. Cook Cnty. Officers Electoral Bd.*, No. 19 CV 7580, 2021 U.S. Dist. LEXIS 215458, at *1 (N.D. Ill. Nov. 8, 2021). Alone, they are not determinative. This Court must still use good judgment and sound discretion.

*     *     *

With these principles in mind, the Court analyzes the particular facts of this case and concludes that this case is not exceptional. It isn't rare, uncommon, or unordinary. It doesn't stand out.

## ANALYSIS

Marcus seeks to establish that this case is exceptional based on its claimed substantive strength and the unreasonableness of Madison's litigation. Some of the arguments Marcus makes overlap both bases. Although the parties' filings on the motion have a blunderbuss character, the Court will attempt to address all the asserted bases as to why this case is exceptional.

**Alleged Substantive Strength of Marcus' Case**

As best as the Court can discern, Marcus makes three arguments regarding the alleged substantive strength of its case: (1) the alleged willfulness of Madison's infringement; (2) the likelihood of confusion between the Hotel Kate and the St.

Kate—The Arts Hotel; and (3) a preemptive strike on one of Madison's anticipated arguments.

### Alleged Willfulness of Infringement

Marcus argues that Madison's infringement was willful. Dkt. 78, at 13. Marcus correctly asserts that willful infringement *can* support a finding that the case is exceptional. Dkt. 78, at 12. Of course, Madison disagrees that it willfully infringed or that it infringed at all. Dkt. 87, at 7, 11.

No doubt, Marcus possesses evidence showing a possible willful infringement. For example, it's a senior holder: Madison appears to have been aware of the St. Kate—The Arts Hotel, and Madison's project had not significantly invested in the name. Indeed, had this case proceeded on the substantive merits, Marcus *may have* established a willful violation. Again, of course, Madison repeatedly and vehemently asserts it would have prevailed but for the changed circumstances requiring it to voluntarily dismiss its action. Dkt. 87, at 6.

A major difficulty results because there was no finding as to willfulness. *See Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1357 (Fed. Cir. 2019); *Spineology*, 910 F.3d at 1230.[3] Because the issue was not litigated on the merits, the Court is forced to decide an unlitigated issue on an abbreviated record.

A good example of the difficulty in determining the competing positions on the willfulness issue relates to the naming of Madison's proposed hotel—Hotel Kate.

---

[3] The Court relies on cases addressing attorneys' fees under the exceptional provision of the Patent Act based on the Supreme Court's decision in *Octane Fitness* and the Seventh Circuit's adoption of that analysis for Lanham Act cases in *Chicago River I.*

Marcus contends that Madison already selected the name "Spafford House" and changed course to name the project "Hotel Kate" to ride on the St. Kate—The Arts Hotel's good name. Dkt. 78, at 7. But Madison has provided significant evidence that the name "Spafford House" was only under consideration and that there was no final decision on that name at any point. Dkt. 87, at 2-3. The possible name "Spafford House" was suggested when potential names were being spitballed. Madison has presented substantial evidence that it decided to name the facility "Hotel Kate" in honor of Kate O'Connor, a well-known suffragette from Rockford, Illinois, who served on the Board of the YWCA. Dkt. 87, at 3.[4]

Under the evidence presented and drawing reasonable inferences from that evidence as well as using common sense and experience, it is just as likely that Madison chose to name the facility "Hotel Kate" after Kate O'Connor as after the St. Kate—The Arts Hotel. In fact, that is the more likely conclusion.

Based on the evidence, the Court is unwilling to find that Madison willfully infringed. Again, Marcus has evidence there was willful infringement, but Madison has evidence there was not.

But even if the Court were to find there was willful infringement, that does not necessarily mean that this case is exceptional. Willful infringement *can* support

---

[4] As this Court previously explained in a prior ruling, Rockford, Illinois was home to the great suffragette, world-renowned humanitarian, and Nobel Peace Prize recipient Jane Addams. Kate O'Connor worked with Jane Addams in the suffragette movement. Dkt. 74, at 1 n.1. The suffragette movement in general and Jane Addams in particular are an important fabric of the Rockford community. In fact, a monument to the suffragette movement is located in front of the YMCA not far from the site of the abandoned YWCA. And Jane Addams was a graduate of what is now Rockford University.

a finding that the case is exceptional, but it doesn't require that finding. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1192 (6th Cir. 1997) ("It does not, however, follow that a case will always be 'exceptional' for purposes of awarding attorney fees where the relevant conduct is found to be willful, fraudulent, and deliberate."); *see also Coryn Group II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468, 499 (D. Md. 2012). "Willful infringement by itself does not entitle a plaintiff to recover attorney's fees." *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 522 (S.D.N.Y. 2019) (*citing 4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 216 (2d Cir. 2019)).

That the infringement *may have been* willful is insufficient to support a finding that the case is exceptional under the totality of the circumstances.

**Likelihood of Confusion**

Marcus contends that its counterclaims were powerful and Madison's claims were weak based upon the alleged likelihood of confusion. Dkt. 78, at 16. Marcus bases this contention in large part on the opinions of its retained experts. Dkt. 78, at 16-17. But, again, Madison counters this contention, likewise relying upon its own expert. Dkt. 87, at 7-8. It is true that both sides possess retained experts who opine favorably for the party that paid them. Marcus asserts that there is not only a likelihood of confusion but also actual confusion. Dkt. 78, at 7-8. However, Madison's expert opined that "it is highly improbable consumers will be confused between the two hotels." Dkt. 87-1 at 9. Madison's expert goes on to conclude, "Based on the analysis and in-depth research conducted for this report, it is highly

unlikely for consumers to confuse, compare or associate the two properties, Saint Kate Arts Hotel and Hotel Kate when researching or booking online." Dkt. 87-1, at 27.

From this point, the parties devolve into taunts that they would have excluded the other side's expert witnesses through *Daubert* challenges. Dkt. 89, at 6; Dkt. 87, at 8. *Daubert* motions are commonplace in modern civil litigation. David F. Herr, *Annotated Manual for Complex Litigation*, §23.35, at 747 (4th ed. 2013) ("Challenges to expert testimony are likely."). In fact, they are too common. Sure as night will follow day, parties file *Daubert* motions to bar the opposition's experts. The filing of *Daubert* motions to bar expert opinions has become a Pavlovian response. Christopher S. Ayres, *Thoughts on Effective Docket Management in Federal Court*, 67 Advocate 19, 23 n.1 (2014) (referring to the filing of *Daubert* motions as "obligatory"). Indeed, as one district judge stated during a panel discussion, "I could have Albert Einstein designated on the Theory of Relativity, and I would still get a *Daubert* motion." *Id.*

But more fundamentally both sides are wrong. Both sides claim that the other side's experts will be barred under *Daubert* because of the allegedly erroneous conclusions the experts reached. Dkt. 89, at 5-6; Dkt. 87, at 8. But that's not what *Daubert* is about. *Daubert* challenges the methodology used by experts, not the ultimate opinions the experts reach. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993). In fact, Marcus' rebuttal expert merely contradicts Madison's expert; it never challenges the methodology. Dkt. 54-7.

Setting aside the fundamental misunderstanding of *Daubert*, this Court has conducted no *Daubert* analysis of any of the experts. No *Daubert* motions were filed because Madison voluntarily dismissed its actions.

This Court is generally skeptical of most experts. *DR Distribs., LLC v. 21 Century Smoking, Inc.*, No. 12 CV 50324, 2021 U.S. Dist. LEXIS 9040, at *24 (N.D. Ill. Jan. 19, 2021). But this Court also understands that expert opinions may be necessary in cases like this and casts no aspersions on the experts in this case. *See Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039-40 (S.D. Ind. 2000). Nevertheless, this Court is in no position to independently engage in *Daubert* analyses of the parties' experts. More importantly, the Court need not do so. The issue is not whether Madison would prevail or Marcus would prevail. The issue is whether Madison's position was unreasonable. And to address that issue, the Court has reviewed Madison's expert's report and does not find that Madison acted unreasonably in relying upon it. Whether it—or Marcus' experts' reports— would withstand *Daubert* challenges need not be decided on this motion. Instead, based on the facts presented, in this particular case, the existence of dueling expert opinions counsels against finding that Madison's litigation was objectively unreasonable. A case may exist in which reliance on an expert opinion is unreasonable, but this is not that case.

### Preemptive Strike

In an obvious attempt to preempt one of Madison's main arguments, Marcus cites to several cases involving infringement claims by hotels against other hotels in

different states.  Dkt. 78, at 17-18.  Again, not to belabor certain facts, but Marcus'

hotel is called the Saint Kate—The Arts Hotel and Madison's anticipated hotel was

to be called the Hotel Kate.  These hotels would be located nearly 100 miles apart in

different cities, in different states.  The clientele would be different, and the

ambiance of the hotels would be different.  The St. Kate—The Arts Hotel is a

beautiful high-end facility in a trendy part of Milwaukee, not too far from the Third

Ward.  The Hotel Kate in Rockford, while perhaps very pleasant, would have been

in a very different type of neighborhood at the site of the abandoned YWCA.  In fact,

the undersigned can see the location from the chambers' window.  To avoid these

obvious distinctions, Marcus cites to several cases in which infringement was found

involving hotels in different states.  Dkt. 78, at 17-18.

Some of these cases are easily distinguishable.  For example, in those cases,

the hotels had identical or nearly identical names.  *See, e.g., Butler v. Hotel Cal.,*

*Inc.*, 106 F. Supp. 3d 899 (N.D. Ohio 2015) (Hotel California); *Coryn Group*, 868 F.

Supp. 2d 468 (Secrets and Seacrets); *Tisch Hotels, Inc. v. Atlanta Americana Motor*

*Hotel Corp.*, 254 F. Supp. 743 (N.D. Ga. 1966) (Americana Hotels and Americana

Motels); *Resorts Int'l, Inc. v. Greate Bay Hotel and Casino, Inc.*, No. 90 CV 3057,

1991 U.S. Dist. LEXIS 21789 (D.N.J. Jan. 18, 1991) (Paradise Island and Paradise

Isle).

But setting aside those easy distinctions, Marcus' argument misses the point.

The issue before the Court is whether *this case* is exceptional, not whether

infringement may have been found in other cases.  *Munchkin*, 960 F.3d at 1379

13

("The relevant question for purposes of assessing the strength of Munchkin's validity position is not whether its proposed construction is *correct*; rather the relevant question is whether it is *reasonable*." (emphasis in original)). What's more, in one of the cases Marcus cites to argue that infringement can occur despite hotels being located in different states, Dkt. 78, at 18, the court specifically found that the case was *not exceptional*. *Coryn Group*, 868 F. Supp. 2d at 499. Moreover, Marcus' argument ignores *Chicago River II*, in which the Seventh Circuit affirmed the district court's finding that the case was *not exceptional* even though both hotels were called "Hotel Chicago" and were located only miles apart in Chicago, Illinois. 988 F.3d at 970.

This merely shows that the Court is required to determine in its discretion whether a case is exceptional based upon the unique facts of the case. *Id*. at 965. Facts and discretion matter. *Id*. at 970. Again, the issue is not whether there could be—or even is—willful infringement. The issue is whether the case is exceptional. The fact that other cases exist showing infringement by hotels with nearly identical names in different states does not further the analysis, particularly when at least one of those cases specifically found the case was not exceptional and the Seventh Circuit has found that a case involving the same hotel name in the same city was not exceptional. Marcus' citation to other cases involving out-of-state hotels' infringement does not help it meet its burden that this case is exceptional.

**Alleged Unreasonableness of Madison's Litigation**

As to Madison's alleged unreasonableness, Marcus raises a cornucopia of assertions. Again, Marcus asserts that there was willful infringement, which the

14

Court has already addressed. Marcus asserts that Madison's claims were meritless. This is the flip side of the "strength" coin, which the Court already addressed. And Marcus asserts that Madison engaged in misconduct before the United States Patent and Trademark Office (USPTO). Finally, Marcus also asserts that various litigation steps Madison took were unreasonable, including that Madison filed first and did so in the United States District Court for the Northern District of Illinois, that Madison only voluntarily dismissed its action after seeing Marcus' expert reports, that Madison failed to seek a "business resolution," and that Madison identified too many individuals with knowledge in its Rule 26(a) initial disclosures.

### Alleged USPTO Misconduct

Having already addressed the willfulness and strength/weakness arguments, the Court begins with the assertion that Madison engaged in misconduct before the USPTO. Dkt. 78, at 14. Unsurprisingly, Madison disputes that it engaged in misconduct before the USPTO. So, once again, the Court is faced with bald assertions from both sides. But, importantly, Madison also argues that actions before the USPTO are irrelevant to the issue before this Court; namely, whether *this case* is exceptional. Dkt. 87, at 10. Marcus never replies to this point. In fact, the Court is at a loss as to how any conduct before the USPTO is relevant to the motion. And without a reply, Marcus has not helped the Court understand its argument. This contention does not support a finding that this case is exceptional.

### Alleged Litigation Misconduct

### Suing in the District Court for the Northern District of Illinois

Marcus claims that Madison engaged in bad faith because "Madison flipped the typical trademark infringement enforcement scheme on its head and forced Marcus to litigate in Madison's preferred venue on Madison's timeline." Dkt. 78, at 15.[5] But Marcus admits that Madison filed suit "in response to Marcus's notice of infringement." *Id*. In fact, it was Marcus' threat to sue Madison that begat this entire action. It is undisputed that Marcus threatened to take "whatever steps are necessary, including litigation and/or cancellation proceedings" against Madison. Dkt. 87, at 2 (citing Dkt. 1, Ex. 3, p. 17). As Madison puts it, "Marcus all but invited [the litigation]." Strangely, Marcus asserts that Madison's position is "baseless" because there was a delay between Marcus' explicit threat to sue and Madison filing suit. Dkt. 89, at 7. But Marcus does not dispute that it threatened to sue Madison. And it is not improper for a party that has been threatened with litigation to file a declaratory judgment action to determine the rights of the parties. That is precisely why the Declaratory Judgment Act exists. 28 U.S.C. § 2201; *see Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir. 1983). Apparently, Marcus expected Madison to take one of two actions: (1) completely surrender to its demands contained in the notice of infringement; or (2) move forward with the project while risking litigation at any moment. Those are not reasonable expectations. A party's threat to sue often results in a declaratory judgment action

---

[5] Marcus never explains how the litigation timeline would have been more beneficial to it had Madison not filed suit.

being filed against it. *See, e.g., IntellApex, PLLC v. Intel Corp.*, No. 1:05 CV 404, 2005 U.S. Dist. LEXIS 21276 (W.D. Mich. Aug. 26, 2005). The Court is even more confused as to Marcus' focus on the suit being filed in the Northern District of Illinois, which Marcus did not contest possessed jurisdiction and was a proper venue. Dkt. 10, at 2-3. Marcus has not established that Madison's response to Marcus' explicit threat to sue it was unreasonable.

### Timing of Voluntary Dismissal

Marcus argues that the timing of Madison's decision to voluntarily dismiss is evidence of litigation misconduct. Dkt. 78, at 12, 16-17; Dkt. 89, at 7. The Court will set aside its experience that most defendants welcome motions for voluntary dismissal, particularly when the motion results in dismissal with prejudice as happened here. Dkt. 74, at 7. And to the extent that Marcus is arguing the mere fact that Madison voluntarily dismissed its action shows the case is exceptional, the Court rejects that unsupported argument. *Munchkin*, 960 F.3d at 1381 ("Munchkin's dismissal of its claims with prejudice also does not establish, by itself, a finding that the merits were so substantively weak as to render the claims exceptional.").

Under Marcus' view, Madison dawdled and did not file its motion for voluntary dismissal until after Madison obtained Marcus' retained experts' reports. Dkt. 78, at 12; Dkt. 89, at 7 ("While Madison contends that its request for dismissal should have no bearing on any assessment regarding the weakness of its claims, the timing and content of dueling expert reports tells a different story.") According to

Marcus' theory, Madison became so scared, impressed, and overwhelmed with the forcefulness and merits of these opinions that it decided to hightail it out of this litigation. Dkt. 78, at 12 ("Throughout the course of this litigation, Madison pressed its meritless claims for eighteen months, imposing significant expenses on Marcus, only to drop the case and agree to take the actions proposed by Marcus at the start after being served with expert reports demonstrating what Marcus had been telling it all along—that Madison's conduct created real customer confusion.").

Not surprisingly, Madison portrays a very different picture. Dkt. 87, at 6-7 ("Madison sought to dismiss the case for reasons explained in its Motion to Voluntarily Dismiss, with prejudice, that due to changed circumstances in the financial markets and substantial increased costs of materials for the Hotel Kate project resulted in the Hotel Kate project no longer being financially feasible."). According to Madison, it voluntarily dismissed its action because of a change in circumstances. Dkt. 87, at 6-7. Madison previously explained in detail that the reason for the voluntary dismissal was a financial change in circumstances. Dkt. 59-1. Madison obtained the abandoned YWCA property in 2010 and in 2016 explored various uses of the property, including converting it into a boutique hotel. Significant funds and efforts went into the process, including obtaining a historic designation from the National Park Service. In 2019, Madison sought bids for the project, which it then used to attempt to obtain financing. Dkt. 59-1, at 2. COVID-19, unfortunately, slowed the process. Financing was obtained in May 2022, but by

that time the bids were outdated, requiring the need to obtain new bids.  Dkt. 59-1, at 2.  Under oath, Madison summed up the situation:

> Due to historic inflation and the rapid rise in the overall cost of construction, materials, and equipment, the new bids came in several million dollars in excess of the original bids.  After obtaining the revised bids and projections for the project, it was determined that the project was not financially viable at that time.  Further, one of the project's lenders advised Madison Street Properties that it was withdrawing its financing commitment due to market conditions and interest rates.

Dkt. 59-1, at 2.

Drawing reasonable inferences and applying common sense, ordinary life experiences, and Occam's razor, the Court easily concludes that Madison's version of events as to its motivation to voluntarily dismiss is the more plausible explanation.  The planning for the Hotel Kate began before the pandemic.  Then the COVID-19 pandemic struck the world.  Things stopped.  Plans were derailed. Businesses closed.  It was during this time that Madison was attempting to obtain financing to rehabilitate the long-shuttered YWCA to create a hotel, which, by the way, only makes money when people travel.   Anybody purchasing a piece of plywood or a two-by-four during and shortly after COVID-19 is well aware of the cost increases, not to mention supply chain issues.  The Court can take judicial notice that to address rising inflation, the Federal Reserve began hiking interest rates beginning in the spring of 2022 through the summer of 2022, when Madison

19

was seeking financing. Fed. R. Evid. 201.[6] Marcus' theory that their experts' reports were so powerful that they caused Madison to voluntarily dismiss its case is pure, grandiose speculation that blinks reality. Marcus has failed to establish that the timing of Madison's voluntary dismissal was unreasonable.

### Failure to Seek Business Resolution

Marcus asserts that Madison took an unreasonable litigation position by failing to settle the actions. Dkt. 78, at 15; Dkt. 89, at 8. According to Marcus, "Throughout the lawsuit and even in the early court-mediated settlement conference . . . Madison insisted that it was opening the Hotel Kate and refused to even consider a name change when nothing about the project depended on using the 'Hotel Kate' name." Dkt. 78, at 15. In response, Madison asserts that it was Marcus that was unreasonable in failing to reach a "business resolution" and making unreasonable settlement demands. Unsurprisingly, Marcus claims it was Madison that made unreasonable settlement demands. Indeed, both sides claim that the other side demanded total surrender. Dkt. 89, at 8-9; Dkt. 87, at 9-10.

At the outset, the Court cautions both sides about violating the Court's orders making settlement discussions confidential. *See* N.D. Ill. L.R. 83.5. But, because both parties have violated the confidentiality provision, placed the substance of the negotiations in dispute, and have presented diametrically opposed positions as to the negotiations, the Court has been forced to review the settlement communications sent to Magistrate Judge Schneider to determine if the failed

---

[6] https://www.federalreserve.gov/monetarypolicy/openmarket.htm (last updated July 26, 2023)

settlement discussions amounted to litigation misconduct by Madison. Having done so, the Court understands why the action did not settle. Neither side entered the settlement discussions with the proper frame of mind to amicably resolve the case. To the extent Madison was unreasonable in settlement discussions, Marcus was just as unreasonable. Each side demanded complete capitulation from the other side. Counsel are reminded that the Western Division of the U.S. District Court for the Northern District of Illinois is located at the Stanley J. Roszkowski U.S. Courthouse, not Appomattox Court House. Litigants participating in settlement conferences should not demand—let alone expect—a complete victory and total surrender from the other side. As a magistrate judge, the undersigned settled hundreds of cases. In this Court's view, based upon the parties' submissions, Magistrate Judge Mort Denlow (ret.), Magistrate Judge P. Mike Mahoney (ret.), and Magistrate Judge Sid Schenkier (ret.) working around the clock as a tag team couldn't settle this case. Marcus has not established that the failure to reach a "business resolution" is evidence of litigation misconduct by Madison.

### Proper Compliance with Rule 26

Marcus takes issue with Madison's listing of "***fifteen***" (emphasis in Marcus' brief) individuals with knowledge in Madison's Rule 26(a)(1)(A)(i) disclosures. Dkt. 78, at 13-14. Unsurprisingly, no case law exists holding that complying with the Federal Rules of Civil Procedure is unreasonable. Indeed, Marcus' argument is bizarre and fundamentally misunderstands the basic principles of Rule 26(a)(1). The text of Rule 26 is a good place to start. Rule 26 provides for "required

disclosures" based on a "duty." Fed. R. Civ. P. 26(a)(1)(A). These terms are

contained in the headings. Continuing with that theme, Rule 26 provides that "a

party *must* . . . provide to the other parties [the required information under Rule

26]." Fed. R. Civ. P. 26(a)(1)(A) (emphasis added). If one were needed, the Advisory

Committee Notes provide further explanation: "As officers of the court, counsel are

expected to disclose the identity of those persons who may be used by them as

witnesses or who, if their potential testimony were known, might reasonably be

expected to be deposed or called as a witness by any of the other parties." Advisory

Committee Note, 1993 Amendment. "Rule 26 is designed to require full disclosure

of relevant information and to encourage fair play." *Fid. Nat'l Title Ins. Co. v.*

*Intercounty Nat'l Title Ins. Co.*, No. 00 CV 5658, 2002 U.S. Dist. LEXIS 11916, at 22

(N.D. Ill. Jul. 1, 2002). So, like all good judges, both this Court's and Magistrate

Judge Schneider's standing orders "require[] full and proper Rule 26(a)(1)

disclosures by all parties." All parties appearing here should know that. Indeed,

this Court expects and demands full compliance with Rule 26. And it does so for

obvious reasons other than the plain text of the rule; namely, absent full compliance

with Rule 26, the Rule 16 case management order's value is fundamentally

compromised, which leads to the failure to meet the goal as articulated in Federal

Rule of Civil Procedure 1—to "secure the just, speedy, and inexpensive

determination of every action and proceeding." Fed. R. Civ. P. 1; Thomas A. Mauet,

*Pretrial*, 205 (7th ed. 2008) ("Only when there is candid, open communication

among the parties and judge will the result be mutually beneficial: a scheduling

order that realistically and efficiently regulates the remainder of the litigation process."). Because of the importance of complete and proper disclosure under Rule 26, the consequences for failure are dire—the witnesses are barred absent harmlessness or substantial justification. Fed. R. Civ. P. 37(c)(1). Not to put too fine a point on this, but the failure to disclose witnesses and the subsequent barring of those witnesses is tantamount to legal malpractice. *See National Union Fire Ins. Co. v. Dowd & Dowd*, No. 97 CV 6200, 2000 U.S. Dist. LEXIS 5217, at *4 (N.D. Ill. Apr. 5, 2000). Simply put, Marcus' contention that Madison's proper compliance with Rule 26(a)(1)(A)(i) was litigation misconduct is wholly meritless and unreasonable.

To the extent Marcus argues that the proper identification of individuals likely to have discoverable information was unreasonable because it caused Marcus to conduct seven depositions, that argument fails as well. There is no requirement that all—or even most—individuals identified under Rule 26 must be deposed. In fact, it is hornbook law that not all witnesses need—or even should—be deposed. Mauet, *supra*, at 274; Steven A. Weiss et al., *Discovery in Federal and State Courts in Illinois* 7 (2d ed. 2003); R. Lawrence Dessem, *Pretrial Litigation in a Nutshell* 187 (4th ed. 1992). This is true even of expert witnesses because there are many good reasons not to depose experts. Gregory P. Joseph, *The Temptation to Depose Every Expert*, 40 A.B.A. Sec. Litig. 1 (2014); William A. Cirignani, *The Case for Not Taking Defense Expert Depositions*, 18 Trial J. 20 (Winter 2016). Despite Marcus' bald assertions, from this Court's vantage point and based on its experience, it

appears that Marcus could have obtained the information it needed to both defend against Madison's claims and prosecute its counterclaims without taking seven depositions. For example, in arguing that Madison's action was meritless, Marcus primarily relies on documents that were produced and transcripts from the two most obvious deponents, the sole member of Madison and a 30(b)(6) witness. In fact, as Madison rhetorically asks, if Madison's claims were so weak and Marcus' claims so strong, why did Marcus engage in extensive and seemingly unneeded discovery? Dkt. 87, at 8.

## CONCLUSION

There's no doubt that Marcus prevailed in this litigation. But merely prevailing does not make a case exceptional. There's also no doubt that Marcus contends its case was strong and that Madison's actions were unreasonable. But, having carefully reviewed the factual record and the legal arguments, in its discretion, the Court finds that Marcus has failed to meet its burden to establish these contentions. In fact, a fair reading of the motion as well as the filings preceding it indicate that Marcus seeks attorneys' fees to punish Madison. But that's an improper use of Section 1117(a). *See Spineology*, 910 F.3d at 1231 (a fee award is not to be used as a penalty for failing to prevail). The motion for attorneys' fees under Section 1117(a) is denied.

Entered: September 11, 2023        By: _____

Iain D. Johnston
U.S. District Judge

24